# VIRGIL A. BOGUE

### *v.*

# CHESTER K. WILLIAMS.

1. EQUITY—*notice to affect creditors.* Where a person was in possession of land belonging to government, and conveys it, while a judgment is in full force against him, and reserves the right by the deed to hold the possession for seven months afterwards, and the deed is accepted and the grantor retains possession, and the grantee advanced the money to another person who was a defendant to the same judgment, who entered the land before the time for the grantee to take possession had elapsed, with the agreement that he would convey to the grantee: *Held*, That the judgment became a lien upon the land as soon as it was entered, and that a conveyance of the land according to the agreement would not cut off the lien, as there was no record, possession or other notice of the agreement to the creditors before or at the time the lien of the judgment attached.

2. SAME. To protect a party holding an equitable title, there must be something of record, or such a possession as will put purchasers or creditors upon inquiry which would lead to notice, or they must have actual notice of the equitable title or right.

3. SAME. Even a possession of a part of the premises by a growing crop of wheat, by arrangement with the occupant, entered into before the deed is made by him, or the land is entered, is not such notice, as the possession is under the

occupant and not the trustee who enters the land, and it is not connected with the trust thus created, and such possession cannot affect the rights of the purchaser under the judgment, and his deed will not be canceled or his title conveyed to the grantee of the person who entered the land.

Appeal from the Circuit Court of Stephenson county ; the Hon. Benjamin R. Sheldon, Judge, presiding.

The opinion states the case.

Mr. F. C. Ingalls, for the appellant.

Mr. Thomas J. Turner, for the appellee.

Mr. Justice Walker delivered the opinion of the Court:

The bill alleges, that appellee bought the land in controversy, of Horatio Wales, about the first of October, 1840 ; that he at once went into possession, and has continued to occupy it until dispossessed by the writ of possession in an ejectment between the parties to this suit; that when he purchased of Wales, the legal title was in the general government, but the land was then held and occupied by one Oliver C. Kellogg; that in the latter part of the year 1841, or early in 1842, Kellogg was about to enter the land under his pre-emption, and, recognizing complainant's rights, he called on appellee to advance his portion of the money necessary to purchase it from the government; that there was no other mode by which appellee could secure his rights, but to permit Kellogg to enter the land under his pre-emption, which he did ; and that appellee paid Kellogg for the purpose, $25.00, before the entry was made; and, to carry out the agreement, Kellogg conveyed to appellee on the 13th of June, 1842, the land in controversy.

That in March, 1841, *The People* for the use of *Rhines*, recovered a judgment against Kellogg, Wales, Bogue and

others, upon which an execution was issued, under which the land was sold to Edward F. Dutcher, who subsequently conveyed to Applington, and he conveyed to appellant. It is alleged that appellee was in possession, which was notice of his rights to the several grantees under the sheriff's sale and deed, and that appellant purchased with actual notice.

There seems to be but little, if any, contest about any of the facts, except as to the possession as notice, when the judgment became a lien. It appears, from the register's certificate, that the land in controversy was entered on the 13th day of July, 1841. The title being in the government prior to that time, the judgment rendered in the month of March previously, could not become a lien on the legal title to this land before it was entered, although Kellogg or Wales, against whom it was rendered, may have been in possession. The sale by the government vested all of the title in the purchaser. A mere naked possession, with a right to purchase, formed no such title as the judgment could operate upon as a lien, the fee being in the government. But so soon as Kellogg made the entry, the judgment became a lien upon the land so entered, subject to the equities of all persons in the premises. The question is then presented, as to whether appellee had equities, and if so, whether the judgment creditor had notice of record, by possession or otherwise, of his rights.

If Kellogg did enter the land in controversy for appellee, there was nothing of record to indicate it, or to put the public upon inquiry; and, unless appellee was in the open, visible possession, or the creditors had notice before their judgment became a lien, even if his rights were *bona fide*, he could not enforce them. The deed seems to have been made by Wales to him, in April, 1841, after the judgment was rendered, and it provided that the grantor should retain possession until the following November. The entry was made by Kellogg, on the 13th of July, 1841, and the lien of the judgment then attached against any interest that either Kellogg or Wales

had in the land. And the deed from Wales to appellee, which was then on record, informed the world that Wales was in possession, and that appellee was not, or even entitled to it. And, as the deed only transferred Wales' right of possession as a squatter on government lands, and to have the improvements, if he should enter the lands or become the purchaser of the title, he never obtained any legal right either to the possession or the title, until he received the deed from Kellogg. Had the land not been entered until after November, 1841, he would then, under Wales' deed, have become entitled to possession ; but when Kellogg purchased of the government, he acquired the fee, and it carried with it the right to immediate possession. Both the title and right of possession then united in Kellogg. The entry took away Wales' right to retain the possession, and defeated appellee's right to take the possession.

When the entry was made, there were no equities existing between Wales and Kellogg, of which Wales' possession was notice. And appellee not being in possession, the public were not informed of the equities that are claimed to have existed between him and Kellogg. Had appellee been in the open possession, then the equities existing between them, if not fraudulent as to creditors, would have been protected through his possession. But he was not in possession, nor was he entitled to possession when the entry was made. Nor can his equities be protected through the sale by Wales to him, as that only related to Wales' naked possession, unconnected with Kellogg, or his agreement to enter the land for appellee. Had any one inquired of Wales how he was holding, he would have been informed that he was in possession claiming in his own right. Or had the inquiry been made of appellee as to his claim, he would have replied that after the first of the next November, he would, by virtue of the deed, become entitled to possession, if the land should not be entered before that time. He could not have claimed that

Wales had paid Kellogg the money with which to enter the land, and that he had purchased of Wales that equity.

He, however, independently, while Wales was in possession and entitled to hold the possession, in his own right, paid the money to Kellogg with which to purchase the land from the government, with an agreement that it should afterwards be conveyed to him. There is no evidence in this record, although the deed from Wales to appellee was recorded, and Wales had possession, to put any one upon inquiry as to the agreement between Kellogg and appellee. It seems to have been entered into just before the entry was made, and at which time the judgment became a lien, and the possession was then in Wales, and there was no written agreement between Kellogg and appellee on record, or anything to put purchasers or creditors on inquiry, or that pointed them to the agreement by which it is claimed that the trust was created, and which it is insisted should protect the rights of appellee. It appears that Kellogg did not convey to appellee until in June, 1842, and although the latter may have acquired possession under Kellogg and his deed from Wales, still it was subject to the lien of the judgment.

It nowhere appears that appellee entered into possession under the arrangement with Kellogg to enter the land for him before the entry was made. But, by accepting Wales' deed, he had no right to enter without the consent of Wales, nor does it appear that Wales and appellee changed the relations that existed between them. Wales did not agree to hold under appellee and become his tenant, but remained in his own right. Nor can it be urged that because Wales purchased of Kellogg, he had equities, as it was but a mere naked possession that he purchased, and if it created an equity, as they were both defendants in the judgment, it would be inequitable to enforce it against the rights of the judgment creditors. By that sale, all of Wales' equities were extinguished and passed to the purchaser under the sheriff's deed.

It is insisted that appellee was in possession by sowing a crop of wheat on the land, in the autumn of 1840, which did not mature until the next summer. There was evidence tending to prove this fact, but, if true, the subsequent execution of the deed by Wales, and its acceptance, seem to limit that possession to a tenancy, or a mere holding under Wales. If in possession, why provide in the deed that Wales should retain it until the next November. If appellee did have wheat on the land in the summer of 1841, it fails, when considered in connection with the other facts, to prove that he was holding in his own right, or under Kellogg when the entry was made, and the judgment became a lien. Hence, that did not affect the rights of the purchaser under the execution.

We have not discussed the question of fraud, although the evidence would justify the conclusion that the purpose of the parties was to defeat the collection of the judgment, and still retain the use of the property for Wales. In either view, we are clearly of the opinion that appellee has failed to establish such an equity as would require the cancellation of appellant's title, or its conveyance to appellee. The decree of the court below must be reversed and the cause remanded.

*Decree reversed.*