DILTS, ET AL. v. MECHAM, ET AL.

(No. 1897; June 6, 1935; 45 Pac. (2d) 920)

(Rehearing denied October 1, 1935)

For the defendant and appellant, there was a brief and also an oral argument by *Joseph Garst,* of Douglas.

For the plaintiffs and respondents, there was a brief by *John D. Dawson* and *T. C. Daniels,* both of Douglas, and oral argument by *Mr. Dawson.*

RINER, Justice.

This case comes here by direct appeal, seeking the review of a judgment of the district court of Converse County. The action was instituted in that court by Fred Dilts and Archie Picklesimer, as plaintiffs, against Vernon Mecham, Melvin Mecham, Harry Isaac

and Lenora Isaac, as defendants. Judgment being rendered in plaintiffs' favor, of the defendants Harry Isaac alone appealed. The facts material to be considered as they appear in the record are in summary these:

About February 15, 1929, the plaintiffs through one Robert George, who at the time was ranch foreman for Archie Picklesimer, made an arrangement with Vernon Mecham, an employee on the ranch, whereby Mecham agreed to make a homestead filing upon some 640 acres of land situated in Converse County, Wyoming. It was agreed also that plaintiffs would buy certain improvements which had been placed upon this land by former entryman Mecum, who had lost the entry and who was willing to sell and turn them over to Mecham. This arrangement was carried out, and plaintiffs paid to Mecum the sum of $500.00 for the improvements aforesaid, and also the sum of $36.00, necessary filing fees when the homestead entry was made.

The parties above named met at the Douglas National Bank in Douglas, Wyoming, on February 15, 1929, where a bank official, acting for plaintiffs, drew up and there were executed by the owner thereof a bill of sale for the improvements aforesaid running to Mecham; a note by Mecham for $800.00, payable to plaintiffs three years after date, with interest at eight per cent per annum; a mortgage by Mecham to plaintiffs upon the lands included in the proposed entry; and a lease by Mecham running to Dilts and Picklesimer, upon said lands for three years, "for the purpose of grazing stock only" and for a stipulated rental of "$64.00 per annum, same to be applied in payment of the interest on" the note aforesaid. These papers were turned over to the bank official, who kept them in the deposit box of Dilts in the bank. This lease was never recorded and the mortgage was not

placed of record in Converse County, Wyoming, until November 23, 1932.

It appears that Vernon Mecham at the time of this transaction, a youth of twenty-one years, asserts—as he states in his testimony—that he was unacquainted with business matters of this kind and that he did not know he was signing a note and mortgage, but thought he was making a homestead filing; that the instruments aforesaid were not filled out when he signed them; and that had he known their nature he would not have affixed his signature.

After the business at the bank had been thus concluded, the parties went to the office of the United States Commissioner, where Mecham made the homestead filing upon the land in question. While there the entryman inquired of George what papers he had signed at the bank, and was told by the latter that the plaintiffs had taken those papers "to protect themselves in case he relinquished and did not go ahead and prove up on the homestead." Mecham took up his residence on the entry, made additional improvements thereon and remained there until 1932, ultimately receiving title to the land from the Government. In the course of improving his homestead he used the truck belonging to Picklesimer, the value of the use thereof being testified to by the latter as the sum of $15.00.

In the fall of the year last mentioned the entryman sought to sell the property and approached Picklesimer concerning the matter. The latter, claiming that the plaintiffs had a lease for another year on the entry, declined to offer more than $1000.00 for it. There seems to be a dispute in the testimony given by these parties as to whether anything was said by Picklesimer at this time relative to the mortgage executed by the entryman, as above described, Picklesimer claiming it was mentioned and Mecham declaring that it was not. The offer not meeting with the entryman's approval,

he sought to find another person who would buy the land.

The appellant, Harry Isaac, was a neighbor of the plaintiffs. Picklesimer passed him on the road frequently, and on one occasion, about the spring of 1929 or 1930, Picklesimer told Isaac to keep off the land included in the Vernon Mecham homestead entry, as he (Picklesimer) had a lease on it; he did not, however, tell Isaac then that he had a mortgage on the land and never told him so.

Shortly before November 8, 1932, Vernon Mecham came to Isaac and requested him to buy the land included in the homestead entry acquired as above detailed. Mecham being unable to give Isaac any precise information as to the state of the title to the entry other than he thought there was a five year lease on it to Picklesimer, but that he did not know about the matter certainly, it was agreed that the next day Mecham would meet Isaac in Douglas, the county seat of Converse County, and the county records would then be examined. The following day Vernon Mecham and his father, Melvin Mecham, went to one Daniels, a lawyer in Douglas, and requested him to go to the Douglas National Bank to ascertain the facts about the lease. Daniels did this and reported to the Mechams that "there was a $800.00 mortgage against the place, due in three years, one year past due; that it was recorded in the courthouse at Douglas, also in the Land Office at Cheyenne." The Mechams then left Daniels' office and shortly afterwards met Isaac on the street, but failed to tell him of their conversation with Daniels or anything regarding the latter's statement of there being a mortgage on the property involved. All three, the Mechams and Isaac, thereupon went to the County Clerk's office and had the Clerk make an examination of the records there. The official told them and showed

them that there was "nothing against it," and, as he said, it was "clear as a bell."

Following this investigation the Mechams and Isaac went to another lawyer's office in Douglas, where papers were drawn to complete the sale of the land from Vernon Mecham to Harry Isaac, for the purchase price of $1500.00,—a warranty deed from Vernon Mecham and wife to Harry Isaac, dated November 8, 1932, and acknowledged as of that date, which deed was duly recorded in Converse County on November 9, 1932; a check for $500.00 payable to Vernon Mecham and signed by Harry Isaac; a note for $1000.00 dated November 8, 1932, due on or before thirty days after date, payable to Vernon Mecham, signed by Harry Isaac and Lenora O. Isaac; and a mortgage of even date on the land thus conveyed running to Vernon Mecham and signed by Isaac and his wife, Lenora. This mortgage also was placed on the Converse County records on November 9, 1932. Isaac gave instructions to the Converse County Bank to pay the $1000.00 note from certain accounts kept in that bank.

Under date of November 14, 1932, Vernon Mecham assigned the Isaac note and mortgage to his father, Melvin Mecham, in liquidation of his two promissory notes for $500.00 each held by the father for money previously loaned his son. This assignment was duly recorded November 16, 1932.

On the 7th day of January, 1933, the plaintiffs filed their petition in the district court of Converse County against the defendants above named, for the purpose of having their mortgage foreclosed as a prior lien and the interests of all the defendants in the property aforesaid adjudged subordinate thereto. In this pleading it was charged that Harry Isaac purchased the property involved knowing that plaintiffs had a mortgage upon said lands. The seventh paragraph of the petition reads:

"That the defendants Harry Isaac and his wife Lenore Isaac, to secure the payment of the purchase price of said lands, made, executed and delivered to the defendant Vernon Mecham a mortgage on said lands for One thousand and no/100 dollars, due thirty days from November 8, 1932, which mortgage was thereafter assigned by the defendant Vernon Mecham to the defendant Melvin Mecham, his father, who, as this plaintiff is advised and believes and therefore alleges upon information and belief, paid no consideration therefor, the defendant Melvin Mecham well knowing that these plaintiffs held a valid mortgage prior to, and constituting a superior and better lien upon said premises than the said assigned mortgage, with intent to defeat these plaintiffs of collection of their mortgage as aforesaid."

Summons was issued and the return of the sheriff of Converse County shows a personal service of it and a copy of the petition on both the Mechams and Harry Isaac on January 12, 1933. Meanwhile, and on January 11, 1933, a further payment of $500.00 was made by the Converse County Bank on the Isaac note, said note having been left there by Melvin Mecham for collection. The balance of said note, or $500.00, was paid by the bank thereafter and on February 11, 1933.

Harry Isaac in his answer to the petition aforesaid, supplemental to denials of the averments of that pleading, alleged that he bought the premises aforesaid from Vernon Mecham for a valuable consideration and without notice either actual or constructive of plaintiffs' mortgage. Melvin Mecham filed a separate answer, in the main denying the averments contained in plaintiffs' petition. The separate answer of Vernon Mecham in brief consisted of denials of the allegations in plaintiffs' petition and also a claim that he signed the instruments executed at the Douglas National Bank on blank forms, which were later filled out and made into the note and mortgage held by plaintiffs; that he thought he was signing a lease to plaintiffs on

said land for five years; that plaintiffs have been paid in full by the use of said property for grazing from the time appellant made his filing on the homestead entry. He prayed that the mortgage and note be delivered up by the plaintiffs, cancelled and declared void.

No jury was had in the trial of the case and a judgment was entered by the court, which summarized, found that Vernon Mecham executed to plaintiffs the note and mortgage held by them; that there was due thereon the sum of $500.00 advanced by plaintiffs for purchase of improvements on the homestead entry aforesaid, $36.00 advanced by them for filing fees thereon, $15.00 for rental of the truck owned by plaintiffs and used by Vernon Mecham, plus $55.00 attorney's fees, on account of the mortgage foreclosure, or a total of $606.00; that Harry Isaac and his wife were not *bona fide* purchasers of said property, as they had actual knowledge of plaintiffs' mortgage or such facts as would put them upon inquiry which would have so advised them. Plaintiffs' mortgage was accordingly adjudged foreclosed and the land ordered sold to make the amount found due as recited and a personal judgment directed against Vernon Mecham for any deficiency remaining unpaid after the sale and application of the proceeds thereof to the debt thus found due.

The contention is made for appellant that this judgment is contrary to the evidence and that the district court erred in directing its foreclosure. We are inclined to think that there are substantial grounds to support this claim. We have already referred to the fact that Robert George, the foreman of the Picklesimer ranch, was the party who negotiated the deal with Vernon Mecham. That the arrangement he and Vernon Mecham made was the real agreement of the parties is evidenced by the following testimony given by plaintiff Picklesimer on cross-examination:

"Q. Now Mr. Picklesimer, do you intend to charge Mecham interest on this $300.00, he did not get?

A. No, sir.

Q. You don't think you are entitled to interest on that?

A. No. sir.

Q. Only interest you are entitled to is interest on the $500.00?

A. Figured on getting grass for that, Mr. George agreed, told you same thing.

Q. Is it true as has just now been testified to, that Bob George is the one that made the deal with Vernon Mecham when he went in to sign?

A. He talked to Mr. Mecum?

Q. Mecham or Mecum?

A. Both of them.

Q. You had not yourself talked to Vernon Mecham about it before he went in to sign up?

A. No.

Q. You left that to Bob George?

A. Yes.

Q. Only deal supposed to have been made was deal talked over by Bob George and Vernon Mecham?

A. Yes, only deal that I know of.

Q. Mr. Picklesimer, you don't claim you made any other deal with Mecham yourself?

A. No, I don't."

The other plaintiff, Dilts, testified also on cross-examination:

"Q. Did you know anything about the transaction, did you make any of the dealings yourself or was that left up to Archie?

A. I didn't have anything to do with dealings before I signed that lease.

Q. Just a lease is all you signed, all you had anything to do with?

A. That is all I remember.

Q. You didn't make any deal with Mr. Mecham yourself?

A. No.

Q. None was made in your presence?

A. No, sir.

* * *

Q. Now the $500.00 was all you and Mr. Picklesimer had paid out to get these papers signed?

A. Give him $250.00 apiece at the time.

Q. Did you give Mr. Mecham anything?

A. After he made his filing, he asked who was going to pay for this and I put up $36.00 more.

Q. So you included that in the mortgage too?

A. That went into the suit.

Q. When was the amount put in the note and mortgage, or do you know?

A. I don't know.

Q. Then why did you figure you were entitled to interest in between five hundred and eight hundred dollars if you had not advanced it?

A. I wasn't figuring anything about it.

Q. You were not figuring on interest on that $300.00?

MR. DANIELS:—The agreement was made and speaks for itself, I don't see this is relevant and or material.

BY THE COURT:—Go ahead.

Q. You had not paid the $300.00 at that time?

A. No, we paid $500.00.

Q. Did you ever pay anything more?

A. No.

Q. The five hundred dollars is all you really claim?

A. I paid that extra filing fee and I paid $250.00.

Q. All you claim you would possibly have coming on your interest is $250.00 and $36.00 filing fees?

A. That is all I put into it."

Robert George, as a witness for the defense, after stating that he made the arrangements with Vernon Mecham about filing on the homestead, responded in the course of his direct examination as follows:

"Q. Tell us what arrangements or tell us as you stated it to Mr. Mecham?

A. Well he wanted a homestead, and Archie said he could get that Mecum place, have to buy the improvements, and this money that they paid for improvements was to go for lease on the grass is the way I understood it, that is the way I made deal with him.

Q. Is that the way you told him?

A. Yes, sir.

Q. Did you tell Mecham he was to give a mortgage on the place?

A. No, sir.

Q. Did he ask you about the papers he signed down in the bank after he got out and gotten up to Ewel's office?

A. After he signed them he asked about them.

Q. What was said?

A. I told him they took that to protect themselves in case he relinquished and didn't go ahead and prove up on the homestead.

Q. Did Mr. Picklesimer ever tell you he would expect Mecham to pay this $500.00 back in money?

A. No, sir.

Q. Did you ever tell Mecham he was supposed to pay it back in money?

A. No, sir."

Referring to the value of grazing land in the vicinity of Vernon Mecham's homestead entry and the value of

the grazing on that particular property, his testimony was:

"Q. Do you know what grazing land was leasing for?
A. Yes, sir.

Q. What were they leasing for?
A. From one hundred to one hundred and fifty dollars like this one.

Q. Do you know what this particular one had been leasing for?
A. I had heard.

Q. How much?
A. $100.00 and when they put the improvements on it they valued it more than that.

Q. Now you say you told Mr. Mecham they were to have use of the grass for this $500.00 they were paying Mecum?
A. Yes, sir."

We think it reasonably clear, under the foregoing excerpts from the record, that the papers originally drawn and signed at the Douglas National Bank between the parties did not represent the actual meeting of their minds. The trial court evidently thought so too to a certain extent, for the judgment, as has been noted, declined to recognize any amount as due on the principal of the mortgage over the $500.00 paid for improvements to Mecum, except the $36.00 filing fee and the $15.00 for use of the Picklesimer truck. The mortgage given at that time was evidently not to be enforced unless Vernon Mecham failed to secure patent to the land and only in that event.

4 R. C. L. 506, Section 20, says that:

"The jurisdiction of equity to decree the cancellation of an instrument because at the time of its execution the parties or even one of them labored under a mis-

take of fact, is well recognized; and the rule is the same whether the instrument relates to an executory agreement, or one that has been executed."

9 C. J. 1166-1167 is to the following effect:

"Where parties have apparently entered into a contract evidenced by a writing, but owing to a mistake their minds did not meet as to all the essential elements of the transaction, so that no real contract was made by them, then a court of equity will interpose to rescind and cancel the apparent contract as written, and to restore the parties to their former positions. Equity will grant relief on the ground of mistake, not only when the mistake is expressly proved, but also when it is implied from the nature of the transaction. And it is not essential that either party should have been guilty of fraud. As was said in a well considered decision, when one contracting party is led into a losing position by a mutual mistake of himself and the other party, the result is as harmful as if he was wronged by the active fraud of the person with whom he deals. It has also been held that relief may be granted, although the apparent obligations of the parties have been fully performed."

But if the mortgage executed by Vernon Mecham to the plaintiffs should be regarded as valid to the extent allowed by the district court, still under the true understanding of the parties, as clearly disclosed by the record references above recited, it would appear that the debt it secured had been fully paid. It is plain that the plaintiffs had the use of the grazing upon Vernon Mecham's homestead entry not only for the period indicated by the written lease, but also for the grazing season subsequent to its expiration. They never paid any money to Vernon Mecham for the lease of his property, the arrangement made through George being, as he said, that "they were to have the use of the grass for this $500.00 they were paying Mecum." The judgment therefore would seem erroneous in this view of the matter.

But if we should be mistaken in our conclusions as thus expressed, there is yet another point which when fairly considered leads us to a similar consequence so far as permitting the judgment in question to stand.

It will be recalled from what has been already detailed that Harry Isaac paid $500.00 to Vernon Mecham on the purchase price of the property involved at the time the deed to him was given. On Isaac's instructions $500.00 more was paid to Melvin Mecham before Isaac was served with process in the action. It is asserted for respondents, and the court below found, that Isaac had notice of the equities of plaintiffs through their mortgage when these payments were made. It is pointed out that the plaintiffs were in possession of the homestead entry aforesaid and this fact operated to put him on inquiry, which would have led to a discovery of the true situation.

In Townsend v. Little, 109 U. S. 504, 3 S. Ct. 357, 27 L. Ed. 1012, it is said:

"Where possession is relied on as giving constructive notice, it must be open and unambiguous, and not liable to be misunderstood or misconstrued. Ely v. Wilcox, 20 Wis. 523; Patten v. Moore, 32 N. H. 384; Billington v. Welsh, 5 Binn., 132. It must be sufficiently distinct and unequivocal so as to put the purchaser on his guard. Butler v. Stevens, 26 Me. 484; Wright v. Wood, 23 Pa. 120; Bogue v. Williams, 48 Ill. 371. As said by Strong, J., in Meehan v. Williams, 48 Pa. 238, what makes inquiry a duty is such a visible state of things as is inconsistent with a perfect right in him who proposes to sell."

In 2 Pomeroy's Equity Jurisprudence (4th Ed.) 1183-1184, Section 620, the author referring to the rule that "a purchaser or encumbrancer of an estate who knows or is properly informed that it is in the possession of a person other than the vendor or mortgagor with whom he is dealing is thereby charged with a constructive notice of all the interests, rights,

and equities which such possessor may have in the land," further says:

"It is therefore abundantly settled by the decisions, that where the first general rule as stated in a foregoing paragraph is invoked, and the party rightfully in possession under an unrecorded conveyance relies upon the fact of such possession as a constructive notice, equivalent in its effects to a registration, to a subsequent grantee or encumbrancer whose deed or mortgage has been recorded, his possession must be an actual, open, distinct, notorious and exclusive occupancy of the land in question. No mere occupation of the premises in common or in connection with a third person, and no mere exercise of acts of ownership equivocal in their nature over the land, will then suffice."

In the light of these authorities and the uncontradicted fact appearing in the record that Picklesimer told Isaac that he, Picklesimer, had a lease on the Vernon Mecham homestead entry and that Isaac should keep off of it, we think that the latter was entitled to ascribe plaintiffs' possession of the premises to the lease, and was under no duty to inquire further in an effort to uncover an additional or other agreement between Vernon Mecham and the plaintiffs. The possession held by the plaintiffs "was a visible state of things," entirely consistent with the title claimed by them. It would seem Isaac should be protected within the logic of the rule stated by Mr. Pomeroy in the text last cited, that:

"The decisions may be regarded as agreeing upon the conclusion, which also seems to be in perfect harmony with sound principle, that where a title under which the occupant holds has been put on record, and his possession is consistent with what thus appears of record, it shall not be a constructive notice of any additional or different title or interest to a purchaser who has relied upon the record, and has had no actual notice beyond what is thereby disclosed."

There is no other evidence drawn to our attention in the case which would support respondents' contention in this case or the district court's finding under consideration. We are satisfied that when the $1000.00 was paid by Isaac on the purchase price he had no notice of plaintiffs' asserted mortgage.

The final payment of $500.00 was made by the Converse County Bank, however, under the previous instructions given by Isaac after the defendants had been served with the petition and summons in the action. Isaac then knew of the claims of the plaintiffs and that they charged Melvin Mecham, the assignee of the note and mortgage given by Isaac to Vernon Mecham for the remainder of the purchase money, with knowledge at the time he took over the note and mortgage aforesaid that plaintiffs already held a mortgage on the premises.

On the authority of very many cited cases 2 Tiffany Real Property (2d Ed.) 2253-2255, says:

"A purchaser to whom the legal title has been conveyed, and who paid part, but not all, of the purchase money, before obtaining notice of the adverse claim, is usually considered as entitled to protection to the extent of the payments made by him before receiving notice." * * * *

"If the purchaser gives a negotiable note on account of the price, and such note is transferred to a *bona fide* holder for value, the purchaser of the property, though he subsequently receives notice of an adverse claim to the property, cannot avoid payment of the note, and he is consequently in the position of one who has paid value."

See also 2 Pomeroy's Equity Jurisprudence (4th Ed.) 1542-1543, Section 751 and note.

27 R. C. L. 697, Section 460, declares that:

"If the purchaser has given his negotiable note for the purchase money and it has been transferred and is enforceable against him in the hands of a *bona fide*

purchaser, this is equivalent to payment in so far as his protection as a *bona fide* purchaser is concerned, and his rights cannot be affected by notice thereafter received and before the note is actually paid."

The question to be answered by the record before us is, then—Was it proven that Melvin Mecham when he paid value—as he did—for the note and mortgage he obtained from his son had notice that plaintiffs had a prior mortgage on the Vernon Mecham homestead entry? The only indication in the evidence in this case that Melvin Mecham had such knowledge was the statement made to him and Vernon Mecham by the lawyer Daniels, hereinbefore recited, that there was an $800.00 mortgage on the place due in three years, one year past due, which was recorded both in the courthouse at Douglas and also in the land office at Cheyenne. That this is the substance of what Daniels told the Mechams is corroborated by the testimony of Vernon Mecham also. Daniels, though he as one of the attorneys for plaintiffs elicited the statement given above on his examination of Melvin Mecham, did not go on the witness stand. Without objection Melvin Mecham testified also:

"Q. When you had this conversation with Mr. Daniels, and he come back and reported that there was a mortgage, what did Vernon say to that?

A. He said he knew there was no mortgage, supposed to be a five year lease, but he wasn't sure of it.

Q. Did you search the records?

A. I did.

Q. Did you find the mortgage recorded?

A. No.

Q. Did you ever have any conversation with Mr. Picklesimer or hear any conversation by Mr. Picklesimer regarding the existence of a mortgage?

A. I heard him tell the boy there wasn't supposed to be any mortgage on the place, there was a five year lease.

Q. When did you hear him tell it?
A. I think on the 11th day of November, 1932.

Q. Where were you?
A. Trail Creek ranch."

Picklesimer did not deny that the conversation mentioned by Melvin Mecham in his testimony occurred.

As we have seen the note and mortgage given by Isaac to Vernon Mecham were transferred to Melvin Mecham November 14, 1932, and the assignment was placed on the county records the second day thereafter. We are not inclined to think that this statement of Daniels' to Melvin Mecham, made November 8th preceding, was such a one as gave the latter notice of the existence of plaintiffs' mortgage. It is true Daniels said there was a mortgage on the property, but he also said it was recorded in the courthouse at Douglas and in the Land Office at Cheyenne. This statement so far as the record of the instrument was concerned, Melvin Mecham found to be not the fact. His own son as a party to the transaction, who should know if any one would, assured him that there was no mortgage but there was supposed to be a lease. The county records disclosed no mortgage. This fact would seem to have corroborated Vernon Mecham's version of the situation and certainly established the inaccuracy of the information received by Melvin Mecham on November 8th. It tallied also with Picklesimer's statement on the 11th of that month. It harmonized as well with the actual agreement made by the parties, as we have seen. So far as the record discloses Melvin Mecham apparently paid full value for the note and mortgage.

We are reluctant to hold that he should be bound by misinformation and that he should upon receiving it have investigated beyond what he did to unravel the tangled thread of truth. Without more we cannot say that he was chargeable with such notice of plaintiffs'

claims as to deprive him of the status of a *bona fide* purchaser for value. Possessing that status it is perfectly clear that he could have enforced the note he held, against Isaac, and the final payment made by the latter after he had received notice of plaintiffs' claims was not affected thereby. The authorities cited above so declare, and indeed properly, as Isaac had without notice of plaintiffs' equities made an irrevocable promise to pay the entire purchase price.

The judgment of the district court of Converse County is accordingly reversed, with instructions to dismiss plaintiffs' action.

*Reversed.*

KIMBALL, Ch. J., and BLUME, J., concur.